IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAISER NETHERLANDS B.V., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1625 |
| | ) | Judge Cercone |
| TIPPINS INCORPORATED and TIPPINS | ) | Magistrate Judge Mitchell |
| FIELD SERVICES, INC., | ) | |
|     Defendants. | ) | |

REPORT AND RECOMMENDATION

I.     Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Plaintiff (Docket No. 41) be granted, that the arbitration award be enforced against Tippins, that Tippins shall pay to Kaiser $2,600,838.83, plus simple interest as described in the award, and that no liability for the VAT be enforced against Plaintiff.

II.     Report

Plaintiff, Kaiser Netherlands B.V. ("Kaiser"), brings this action to confirm an arbitration award entered on December 5, 2003 by a tribunal of the International Chamber of Commerce ("ICC") in a dispute between it and Defendants, Tippins Incorporated and Tippins Field Services, Inc. (together, "Tippins").

Presently before this Court for disposition is a motion for summary judgment brought by Plaintiff. For the reasons that follow, the motion should be granted.

    Facts

On June 27, 1997, Kaiser was awarded a contract to design and construct a steel mill for a company called Nova Hut in Ostrava, in the Czech Republic, consisting of a "Two Stand

Reversing Mill, an Equalizing Furnace, and related equipment." (Award at 6 ¶ 2.)[1] Later in 1997, Kaiser entered into a subcontract with Tippins Inc. for the design and supply of the equalizing furnace and two stand reversing rolling mill. In 1998, Kaiser entered into another subcontract with Tippins Field Services for field services for the furnace and mill. (Award at 2 ¶¶ 3-4; Burakow Decl. ¶¶ 2-3.)

On or about September 26, 2001, pursuant to the terms of the two subcontracts, Tippins initiated an arbitration proceeding with the ICC against Kaiser, asserting a claim for retainage funds held by Kaiser and for other items. (Burakow Decl. ¶ 4.) On October 31, 2001, Kaiser filed an answer, affirmative defenses and counterclaims in the arbitration. (Burakow Decl. ¶ 5.) The arbitration hearing was held in Vienna, Austria from January 7-10, 2003. (Burakow Decl. ¶ 6.) Pursuant to the terms of the contracts, Austrian law controlled the dispute. (Award at 7-8 ¶ 8, Award at 24 ¶ 94.)

Between the claims and counterclaims, the tribunal considered eleven different claims for monetary compensation: 1) Tippins' claim for retention; 2) Tippins' claim for dedication day/additional work (a day set aside by the owner to show the mill); 3) Tippins' claim for Czech Value Added Tax (VAT); 4) Tippins' claim for cycloconverters (a piece of equipment in the mill); 5) Tippins' claim for various unpaid invoices; 6) Tippins' claim for various change orders; 7) Kaiser's counterclaim for repayment of loans (amounts advanced by Kaiser to keep Tippins financially viable during the project); 8) Kaiser's subsidiary counterclaim for failure to pay subcontractors; 9) Kaiser's counterclaim for defective warranty work; 10) Kaiser's counterclaim for liquidated damages for failure to pass quality tests required by the owner; and 11) Kaiser's

---

[1] Burakow Decl. (Docket No. 44) Ex. A.

2

counterclaim for failure to supply competent personnel. (Award at 2-5.)

On December 5, 2003, the tribunal issued the Award, finding for Kaiser on some issues and for Tippins on others. (Burakow Decl. ¶ 7; Award at 134.) Page 123 of the Award is a chart setting forth which party prevailed on which claim, and detailing the monetary awards in favor of each. (Award at 123.)

In determining the total net amount of the Award, the tribunal applied Austrian law regarding setoff, and set off against each other–that is, added and subtracted–various monetary amounts in favor of each party. This process resulted in a total net monetary award of $2,600,838.83 in favor of Kaiser. (Award at 24 ¶ 94; see also Award at 123, 134.) The tribunal determined that Tippins should pay to Kaiser $2,600,838.83, plus simple interest in various rates on different amounts for certain periods of time, including up to the date of payment. (Award at 134.)

As set forth in the Award, the VAT was handled separately and was expressly not subject to setoff as were the other claims and counterclaims. (Burakow Decl. ¶ 8.) The Award and the chart expressly exclude the VAT issue from the series of setoffs, instead listing VAT at the bottom of the chart, below the line that reads "Total (after set-off)." (Award at 123.) Elsewhere, the Award similarly stated that "with the exception of the VAT claim ... the claims and counterclaims (both with interest) must be set off against one another." (Award at 122 ¶ 676.)

In another section, the Award provides as follows:

> As claims and counterclaims are asserted in the same arbitral proceedings, the respective claims of Tippins respectively Kaiser [sic] will be at the end off-set.... Accordingly, and subject to the exception of [Tippins'] VAT-claim, which can not be off-set, as this claim depends on the issue of invoices, the Arbitral Tribunal will in the end, as the case will be, award either one principal amount to Kaiser against Tippins, and nothing the other way, or award principal amounts to ...

Tippins against Kaiser, and nothing the other way.

(Award at 24 ¶ 94.)

The Award states that the "principal amount of ↑USD 4,199,500 Czech VAT was undisputed." (Award at 45 ¶ 225.) It further states that the tribunal "awards to [Tippins] in exchange against invoices expressly stating Czech VAT, the amounts there expressed, up to a maximum of USD ↑4,199,500." (Award at 45 ¶ 227.) It further indicates that either a 22% or a 5% tax rate should apply, depending upon whether the taxable supply is goods or services. (Award at 43 ¶ 208.)

At the time of the arbitration and Award, Tippins had never issued an invoice for VAT to Kaiser. In fact, as of the date that Kaiser filed the complaint in this case, Tippins had still not issued any invoice for VAT to Kaiser. (Burakow Decl. ¶ 9.) In its opposition to Kaiser's complaint, filed on January 19, 2007, Tippins admitted that it had not submitted an invoice. (Docket No. 11 at 3.)

Procedural History

Plaintiff filed this action to confirm the arbitration award on December 4, 2006. Jurisdiction is based on diversity of citizenship, in that Plaintiff is a corporation incorporated under the laws of the Netherlands; Defendants are corporations incorporated under the laws of Pennsylvania with their principal places of business in Pittsburgh, Pennsylvania; and the amount in controversy pursuant to the arbitration award is in excess of $75,000.00, exclusive of interest and costs. (Compl. ¶¶ 2-4.) 28 U.S.C. § 1332(a)(2). Plaintiff also invokes this Court's jurisdiction pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-08 (the "Convention"). Plaintiff petitions pursuant to 9 U.S.C. § 207

4

for an order confirming the arbitration award.

At a status conference held on March 1, 2007, the Court entered an order giving Tippins until March 30, 2007 to submit an invoice if it was going to do so. (Docket No. 19.) On March 30, 2007, pursuant to the Court's directive, Tippins filed an invoice for the claimed VAT, dated March 22, 2007, which claimed a VAT of $4,199,505.81 and applied a tax rate of 22%. On June 14, 2007, Tippins submitted another invoice to Kaiser, which claimed a VAT of $4,199,499.92 and applied a tax rate of 22%. (Burakow Decl. ¶ 11 & Ex. C.) The invoice was not signed. On June 22, 2007, Tippins provided a signed version of the invoice it issued on June 14, 2007, backdated to March 22, 2007. (Fackler Decl. ¶ 9.)[2]

On September 7, 2006, Plaintiff filed a motion for summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the

---

[2] Pl.'s Reply Br. (Docket No. 49) Ex. 1.

moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

Convention Standard for Confirming Arbitration Awards

The Convention provides that:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207. The principal purpose of acceding to the Convention, as the United States did in 1970, was to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." Scherk v. Alberto-Culver Co., 417 U.S. 506, 509 n.15 (1974).

"Consistent with the policy of favoring enforcement of foreign arbitral awards, parties have limited defenses to recognition and enforcement of an award as set out in Article V of the Convention." Admart AG v. Stephen and Mary Birch Foundation, 457 F.3d 302, 307 (3d Cir. 2006). A district court "must confirm the award unless one of the grounds for refusing specified in the Convention applies to the underlying award." Id. (citation omitted). Moreover, these defenses are to be applied strictly and viewed narrowly. Id. at 308 (citation omitted).

The exceptions set forth in the Convention are as follows: 1) the parties were under some incapacity; 2) the party against whom the award is invoked was not given proper notice or was

6

unable to present his case; 3) the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration"; 4) the composition of the tribunal or the procedure was no in accordance with the agreement of the parties; 5) the award "has not yet become binding on the parties, or has been set aside or suspended by a competent authority of country in which, or under the law of which, that award was made" 6) the subject matter of the dispute is not capable of settlement by arbitration under the law of the country where enforcement is sought; and 7) the recognition or enforcement of the award would be contrary to the public policy of that country. Convention Art. V.[3]

Neither party has invoked any of the exceptions. See Kaiser Br. (Docket No. 42) at 17 ("None of the enumerated grounds has any application here, and Tippins does not contend otherwise."); Tippins Br. (Docket No. 47) at 9-10. Neither party has sought to vacate the Award for any reason. Nor do the parties dispute that the terms of the Award required Tippins to submit an invoice for VAT to Kaiser as a prerequisite for Kaiser to incur the obligation of paying VAT reimbursement to Tippins. (Award at 45 ¶¶ 221-23.)

Rather, the dispute in this case turns on whether the Award required that Tippins send an invoice to Kaiser within a certain period of time and to meet any other requirements of the Czech VAT system. Tippins contends that the Award requires Kaiser to pay VAT in the amount of $4,199,500 and that the only condition precedent is that Tippins send Kaiser an invoice, which it has done. It argues that the Award contained no statute of limitations and no requirement that Kaiser be able to seek reimbursement of the VAT from the Czech taxing authorities.

Kaiser contends that the Award indicated that, if Tippins sent it an invoice in the proper

---

[3] 9 U.S.C. § 201 historical note.

form and within a proper amount of time, it would be obligated to pay Tippins VAT up to a maximum of $4,199,500. However, because Tippins failed to meet its obligations, Kaiser is not required to pay Tippins any amount of VAT.

Structure of Czech VAT Taxation and Reimbursement

Kaiser notes that, according to Tippins' own expert witness, Petr Kotab, under Czech law, a supplier of taxable supply (such as Tippins) must issue to the recipient of the taxable supply (Kaiser) a VAT invoice for such supply within 15 days of the date such taxable supply was delivered. (Kotab Dep. at 59-60.)[4] After a party such as Kaiser receives a proper VAT invoice from a supplier such as Tippins, it would pay the VAT pursuant to that invoice to the supplier. It would then have three years from the date of taxable supply to submit the invoice to the Czech taxing authorities for a refund of the VAT or a credit of the VAT payments if there were multiple transactions. Thus, the VAT liability is passed along from one supplier to the next until liability for the VAT ultimately rests with the final customer. (Brenka Report at 16-17 & Ex. 1;[5] Kotab Dep. at 80-81.) Kaiser notes that the date of taxable supply is critical under the Czech VAT regulations and determines when VAT is due. It also starts the three-year clock running for the claiming of a refund. (Brenka Report at 16-20; Kotab Dep. at 38-39.)

The terms tax reduction, refund, reimbursement and credit all have essentially the same meaning in Czech tax law, meaning that the taxpayer receives reimbursement, by a credit or a

---

[4] Monahan Decl. (Docket No. 45) Ex. A.

[5] Docket No. 45 Ex. B. Exhibit 1 to the expert report of Kaiser's expert, Gabriel Brenka, is a letter opinion from the Czech Ministry of Finance, the taxing authority for the Czech Republic, which confirms the three-year statute of limitations for seeking a tax reduction after the date of taxable supply. Upon being shown this letter, Tippins' expert, Dr. Kotab, said "I agree that this is a true restatement of what those laws say." (Kotab Dep. at 81.)

8

cash payment, for the amount of VAT paid to the taxing authorities. (Kotab Dep. at 42-43.)
Neither Tippins nor Kaiser was the final customer for the project that was the subject of the two contracts. (Burakow Decl. ¶ 12.) Therefore, the net tax cost on Kaiser of any obligation to pay VAT was to be zero. (Brenka Report at 16.) As the Award stated:

> The Czech VAT System is quite similar to VAT Systems in the European Union. As a result, with the exception of the final customer, at each level of contractual relationships in the chain, the net result of the tax cost is zero, provided that both parties to the transaction are properly registered and follow Czech VAT regulations.

(Award at 43 ¶ 209.)

After the three-year window closes, the customer cannot obtain a refund from the Czech taxing authority. Moreover, a taxpayer can only seek a tax reduction if the supplier has issued a VAT invoice. (Brenka Report at 16-18; Kotab Dep. at 74-76, 81-82.)

As noted above, at a status conference held on March 1, 2007, the Court entered an order giving Tippins until March 30, 2007 to submit an invoice if it was going to do so. (Docket No. 19.) On March 30, 2007, pursuant to the Court's directive, Tippins filed an invoice for the claimed VAT, dated March 22, 2007. This invoice listed the "date of taxable supply" as "TBD by Financial Office in Ostrava" and claimed a VAT of $4,199,505.81, applying a tax rate of 22%. (Burakow Decl. ¶ 10 & Ex. B.) The notation "TBD" stood for "to be determined." (Carpenter Dep. at 28.)[6]

On June 14, 2007, Tippins submitted another invoice to Kaiser, this time listing the date of taxable supply as December 8, 2003, which was intended to be the date of the Award (December 5, 2003), but was inexplicably off by three days. The invoice claims a VAT of

---

[6] Docket No. 45 Ex. C.

9

$4,199,499.92 and applies a tax rate of 22%. (Burakow Decl. ¶ 11 & Ex. C; Carpenter Dep. at 19-21.) The invoice was not signed. On June 22, 2007, Tippins provided a signed version of the invoice it issued on June 14, 2007, backdated to March 22, 2007. (Fackler Decl. ¶ 9.) More than three years had elapsed between the date of taxable supply as claimed on this invoice and the first time that Tippins provided Kaiser with any invoice for the VAT (March 30, 2007). (Burakow Decl. ¶ 13.)[7]

Timing of VAT Invoice

Kaiser argues that, as of the date of the award, Tippins needed no additional information to enable it to issue an invoice. (Carpenter Dep. at 44-45, 58-59, 79, 90-92; Kotab Dep. at 72-73.) Tippins has not disputed this point.

Kaiser asserts that Tippins' delay in issuing an invoice has rendered it impossible for Kaiser to seek reimbursement of the VAT from the Czech taxing authorities because more than three years elapsed since the date of taxable supply. (Carpenter Dep. at 44-45, 58-59, 79, 90-92.)

Kaiser states that, in order for it obtain reimbursement or tax reduction from the Czech Republic's taxing authority, Czech law requires submission of a claim no more than three years after the date of taxable supply. (Brenka Report at 14; Kotab Dep. at 74-76, 81-82.) Kaiser also notes that the timing of the invoice was completely within the control of Tippins and that Tippins is responsible for the fact that Kaiser can no longer obtain reimbursement. (Kotab Dep. at 79-80, 92.)

Tippins responds that there are circumstances where a ten-year period may apply for

---

[7] Kaiser indicates that it does not agree that December 8, 2003 was the date of taxable supply, but that it will accept this date for purposes of this motion. (Docket No. 42 at 13.)

10

seeking reimbursement from the taxing authorities. (Kotab Dep. at 76.) However, Dr. Kotab stated that the exceptions that would trigger a ten-year period are limited to the case where "there has been tax proceedings initiated with the taxpayer" or where the "tax authorities have made an action towards determining the tax liability." (Kotab Dep. at 76.) As Kaiser notes, Tippins has not suggested that either of those situations applies here.

Moreover, Dale Fackler, former Director of Finance and Administration for Kaiser (Fackler Decl. ¶ 1), states that:

> I am aware that Dr. Petr Kotab indicated in his deposition that a taxpayer might be able to seek a reimbursement of VAT payments within a ten year period after the date of taxable supply where tax proceedings were initiated with respect to the taxpayer or where the taxing authorities had made an action towards determining the taxpayer's tax liability. Even if that were true, neither of those situations applies with respect to Kaiser Netherlands, as no tax proceedings have been initiated against the company by the Czech Republic taxing authorities, and no action has been taken by said authorities towards determining Kaiser Netherlands' tax liability.

(Fackler Decl. ¶ 13.)

Tippins has asserted that it did not issue the invoice because it believed that doing so would have triggered liability to the Czech Republic, in the sense that "there would have been a bill that had to be paid by Tippins ... to the Czech Republic without getting the money that was due to them from Kaiser." (Carpenter Dep. at 39.) However, Kaiser has proffered evidence that Tippins' tax was due regardless of whether it submitted an invoice. (Kotab Dep. at 62-63, 94, 111.) Kaiser further notes that any alleged concern about its inability to pay would not provide Tippins with a legal justification for failing to submit an invoice. (Kotab Dep. at 95-96, 111.)

<u>Could Kaiser Seek Reimbursement Without an Invoice?</u>

Tippins also argues that Kaiser cannot contend that the lack of an invoice precluded it

from seeking a VAT reimbursement from the Czech taxing authorities because it could have sought reimbursement without an invoice. (Kotab Dep. at 79.) However, Dr. Kotab's testimony was that, although it was theoretically possible for a taxpayer to seek reimbursement without a VAT invoice, to do so "would probably mean lots of complications if tax audits came to Kaiser," and that the "possibility of the taxpayer to justify and prove the taxable supply received is based on the receipt of the VAT document." (Kotab Dep. at 79.) Similarly, Dale Fackler states that:

> In my experience with the processing of VAT claims in the Czech Republic, it would be impossible for a taxpayer like Kaiser Netherlands to try to claim a VAT refund from the taxing authorities without a supporting invoice and documentation from the subcontractor, as this would open the door to unlimited claims with no government controls over claims. The Czech taxing authorities would not even begin discussions on this approach to a VAT reimbursement, and any suggestion by Dr. Kotab to the contrary is inconsistent with my experience.

(Fackler Decl. ¶ 14.)

In addition, Kaiser points to the fact that the Award itself conditioned any right Tippins might have to VAT on its issuance of an invoice to Kaiser. (Award at 45 ¶ 227.) Thus, Tippins' contention that its actions had no effect on Kaiser's ability to obtain reimbursement of VAT is both unsupported by the record and irrelevant to this case.

Adequacy of Invoice

Kaiser points out that the invoice is a single sheet of paper, and provides no basis for an examination of the alleged services or equipment supplied, how the value of those items was determined or how Tippins calculated the amount of VAT or the applicable tax rate. It merely lists an alleged value supplied, imposes a 22% tax rate without further explanation and claims an outstanding VAT of $4,199,499.92. Tippins disputes that Kaiser is entitled to any further documentation and contends that the amount awarded by the tribunal was undisputed.

12

(Carpenter Decl. ¶ 24;[8] Award at 44-45.)

Kaiser notes that the amount of VAT requested in the March 30, 2007 invoice was in excess of the cap of $4,199,500 allowed by the Award. (Carpenter Dep. at 57.) Tippins does not dispute this point. Kaiser also notes that, according to Tippins' own expert, the use of "TBD" for the date of taxable supply rendered this invoice defective. (Kotab Dep. at 36.) Tippins asserts that making modifications to an invoice, as it did on June 14, 2007, is permitted under Czech law. (Kotab Rebuttal Report at 8 ¶ 29.)[9]

Kaiser notes that Tippins' own expert had no idea how Tippins determined the applicable tax rate, but confirmed that different rates apply depending whether the taxable supply at issue consists of goods or services. (Kotab Dep. at 123.) He further acknowledged that a rate of 5%, rather than 22%, applies to construction jobs. (Kotab Dep. at 125.) Kaiser also argues that Tippins does not know how the tax reflected on the invoice was calculated, other than to say it was based on the Award. (Carpenter Dep. at 54-55.)

The Award stated that Tippins provided Kaiser with $18,476,134 of Czech goods and $2,695,000 in Czech services. (Award at 44 ¶ 216.) Tippins points to the fact that the Award states that it was responsible for paying: "(1) the Czech 22% VAT rate on goods that were purchased in the Czech Republic; and (2) the Czech 5% VAT rate on services performed in the Czech Republic." (Award at 43 ¶ 208.) Tippins notes that multiplying these amounts by rates of 22% and 5%, respectively, yields results of $4,064,749 and $134,750, or a total of $4,199,499. Thus, Tippins asserts that, based on the evidence presented at the arbitration, the amount that

---

[8] Docket No. 47 Ex. F.

[9] Tippins Resp. (Docket No. 47) Ex. D.

Kaiser was determined to owe Tippins was $4,199,500 and it was undisputed. (Award at 45-46 ¶¶ 225, 227-28.)

Kaiser responds that the Award states that Tippins could obtain VAT "up to a maximum of $4,199,500" and that the reason the amount was undisputed is that Tippins had not yet submitted an invoice, and thus there was nothing for Kaiser to dispute. (Fackler Decl. ¶ 8.) The tribunal never considered, nor could it consider or have the authority to consider, what documentation would be sufficient to the Czech taxing authority to support a VAT invoice. (Fackler Decl. ¶ 10.)

With respect to the documentation issue, Kaiser argues that Tippins is referring to a portion of the Award that notes that Tippins had provided sufficient documentation to Kaiser to support a *change order*, not a VAT invoice. Tippins has not supported its argument that the amount of VAT was exactly $4,199,500 and that Kaiser cannot dispute it.

<u>Kaiser Could Not Condition Payment of VAT on its Ability to Be Reimbursed</u>

Tippins notes that the Award expressly provides that Kaiser "was not entitled to request an agreement that Tippins would only be paid for the VAT value billed after Kaiser ... had received payment or reimbursement from the Czech government." (Award at 44 ¶ 218.) It further notes that the Award stated that, "[a]s soon as Tippins has submitted such a bill to Kaiser, this bill becomes payable." (Award at 45 ¶ 223.) Tippins indicates that it sought interest on its VAT claim, but the tribunal rejected this request because Tippins had not submitted an invoice. It was also not permitted to seek costs or attorney fees. (Award at 45 ¶¶ 223-24.)

Tippins contends that the inability to obtain a VAT credit does not per se render the invoice invalid. (Kotab Rebuttal Report at 2 ¶ 8.) Tippins quotes from Dr. Kotab's rebuttal

14

report that "to claim that the validity of a VAT invoice includes, among other [things], also the ability of its recipient to claim on its basis a VAT credit from the state ... would lead to absurd situations." (Kotab Rebuttal Report at 3 ¶ 9.) However, Kaiser notes that Dr. Kotab continued as follows:

> Thus, for example, a recipient of the VAT invoice is not entitled to a full or any VAT credit if it is not registered as a VAT taxpayer, if it has not used the received taxable supply for its business or other similar activity, if it has not used the received taxable supply for certain qualified supplies performed by itself, etc.

(Id.) (footnotes omitted). Kaiser argues that, unlike the current situation, in each instance cited by Dr. Kotab, the taxpayer's inability to obtain a reimbursement would be based solely on its own action or inaction. By contrast, Kaiser's inability to obtain the reimbursement of the VAT in this case was caused solely by Tippins' decision not to issue an invoice within three years of the taxable supply. Thus, Kaiser asserts that Dr. Kotab's examples do not apply.

Morever, the fact that the Award did not permit Kaiser to condition its responsibility to pay VAT to Tippins upon its own ability to obtain reimbursement from the Czech taxing authorities does not mean that the Award contemplated Tippins waiting until Kaiser could no longer obtain reimbursement from the taxing authorities and then submitting its invoice, which effectively made Kaiser responsible for the entire amount of VAT.

Tippins argues that Dr. Kotab states in his expert rebuttal report that the invoice "contains all legal requisites prescribed by Czech laws and regulations relating to value added tax and that the invoice, on its face, does not suffer from any defects or deficiencies." (Kotab Rebuttal Report at 11 ¶ 43.) However, as explained above, Dr. Kotab has not supported Tippins' claims that Kaiser had ten years in which to obtain reimbursement and that it could obtain reimbursement of the VAT without an invoice.

15

As noted above, the Award expressly states that Kaiser "is only obliged to refund the VAT to Tippins against counter action upon receipt of a bill from Tippins to be submitted for tax reduction." (Award at 45 ¶ 222.) Kaiser argues that, in order for the phrase "to be submitted for tax reduction" to have any application, it must mean that the invoice submitted by Tippins must be in a form that Kaiser could submit to the Czech taxing authorities for a VAT reduction. (Brenka Report at 17; Brenka Rebuttal Report at 3.) Tippins has not proffered any explanation of what the phrase might otherwise mean,[10] nor has it provided any support for its suggestion that the Award merely required it to submit an invoice, no matter how late and no matter in what form.

Kaiser has demonstrated that the Award should be enforced as written, that is, a net monetary award of $2,600,838.83 in favor of Kaiser. Because Tippins did not submit an invoice in a form that Kaiser could submit for tax reduction, namely within three years of the date of taxable supply, Tippins is not entitled to receive from Kaiser any amount for VAT.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Plaintiff (Docket No. 41) be granted, that the arbitration award be enforced against Tippins, that Tippins shall pay to Kaiser $2,600,838.83, plus simple interest as described in the award, and that no liability for the VAT be enforced against Plaintiff.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall

---

[10] Dr. Kotab stated that "the meaning is quite unclear." (Kotab Dep. at 85.) When asked if it means that whatever invoice Tippins submits must be in a form that Kaiser could submit to the Czech taxing authorities for tax reduction, he responded "Well, it is not my firm opinion that the arbitral tribunal wanted to say that." (Id.)

16

have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

          Respectfully submitted,

          s/Robert C. Mitchell
          ROBERT C. MITCHELL
          United States Magistrate Judge

Dated: February 26, 2008